**UNITED STATES DISTRICT COURT**
**WESTERN DISTRICT OF NEW YORK**
━━━━━━━━━━━━━━━━━━━━━━━━━━━━━

**UNITED STATES OF AMERICA,**

                    **Plaintiff,**

                    **v.**                              **04-CR-155E - 01**
**STEVEN KURTZ,**

                    **Defendant.**
━━━━━━━━━━━━━━━━━━━━━━━━━━━━━

## REPORT, RECOMMENDATION AND ORDER

        This case was referred to the undersigned by the Hon. John T. Elfvin, in

accordance with 28 U.S.C. § 636(b)(1), for all pretrial matters and to hear and report

upon dispositive motions.


## PRELIMINARY STATEMENT

        The defendant, Steven Kurtz ("the defendant"), has been indicted with a

co-defendant, Robert Ferrell[1], in a multi-count indictment with having violated Title 18

U.S.C. § 1341 - Mail Fraud (Counts 1 and 2) and § 1343 - Wire Fraud (Counts 3 and 4).

(Docket #1).  He has filed an omnibus motion (Docket #19) wherein he seeks: (1)

dismissal of the indictment; (2) "suppression of all evidence seized pursuant to the

execution of the search warrant for 60 College Street, and to the execution of the

search warrant for a computerized disk or disks;" (3) suppression of "any and all

───────────────────

        [1] It has been established to the satisfaction of this Court that the defendant, Robert
Ferrell, presently suffers from a serious and perhaps terminal illness.  As a result, his case
has been held in a state of dormancy at his request, pending medical treatment and
prognosis.

evidence seized as a result of any alleged consensual search;" and (4) suppression of his statements.

The government has filed a response in opposition to each of these motions. (Docket #30).

## FACTS[2]

The co-defendant, Robert Ferrell, at all times relevant herein, was employed at the University of Pittsburgh in Pittsburgh, Pennsylvania as Chairman of its Department of Human Genetics. He also had the added responsibility of "principal investigator" and as such "was directly and primarily responsible for the safe operation of the Human Genetics Laboratory" and "for knowing and applying the principles and procedures contained within the University of Pittsburgh Biosafety Manual ("the Manual"). The Manual required the "principal investigator" to take appropriate steps to "protect [ ] the health and well-being of staff, students, and the general public against undesirable consequences of experimental work conducted under the auspices of the University of Pittsburgh." The "principal investigator" was required "to register all biohazardous materials with the University of Pittsburgh's Biosafety Officer . . . and follow other procedures and precautions developed by the University of Pittsburgh" including those "set forth in the University of Pittsburgh Education and Certification Program in Research and Practice Fundamentals."

---

[2] The facts recited herein are taken from the Indictment (Docket #1).

"In order to protect intellectual property rights of the University and third party vendors, the University of Pittsburgh's Office of Research issued certain regulations governing the acquisition and transfer of biological agents" wherein and whereby the purchase of biological materials had to be registered with the Office of Research, and if such materials were going to be transferred to a third party, "a material transfer agreement recording the shipment" had to "be filed with the University's Office of Research."

The University of Pittsburgh was a registered customer of American Type Culture Collection ("ATCC") whose business "was to supply biological materials and related products to registered customers.  According to ATCC policy, only approved businesses and institutions with a demonstrated need for the biological materials could become registered customers of ATCC" and "ATCC did not permit customer accounts for individual purchasers."  All purchase orders submitted to ATCC "were subject to an ATCC Material Transfer Agreement" wherein and whereby the purchaser agreed to only use the purchased materials from ATCC in the laboratory and not to "distribute, sell, lend or otherwise transfer" the materials purchased from ATCC or any replicates produced therefrom.  The Material Transfer Agreement further provided that "ATCC and/or its contributors retained ownership of all right, title and interest in the" materials purchased and any replicates developed therefrom.  "Biological material purchased by or through the University of Pittsburgh was deemed University property."

The defendant was a faculty member of the art department of the State University of New York at Buffalo ("SUNY") and a friend of the co-defendant, Robert Ferrell.  "Sometime prior to December 19, 2003, the defendant asked Ferrell to obtain a quantity of biological material" for defendant's use in his art work.

"On or about January 5, 2004," Ferrell effectuated a purchase of biological material from ATCC through the University of Pittsburgh account with ATCC and "on or about January 6, 2004, ATCC mailed a quantity of [biological material] to the University of Pittsburgh Human Genetics Laboratory."  Thereafter, Ferrell mailed this biological material to the defendant at his home address, 60 College Street, Buffalo, New York. In the same manner, a subsequent purchase of biological material was made by Ferrell "on or about March 16, 2004" and "on March 23, 2004, Ferrell mailed this same biological material to the defendant."

The defendant was not authorized by ATCC to purchase or receive its biological materials; nor was he authorized by the University of Pittsburgh to purchase or receive biological materials purchased through the University of Pittsburgh's account with ATCC.

## DISCUSSION AND ANALYSIS

**1.    Motion To Dismiss The Indictment:**

Basically, the indictment charges the defendant with "having devised a scheme and artifice to defraud, and for obtaining property by means of false and fraudulent pretenses, representations, and promises" through the use of a "commercial interstate carrier" (Counts 1 and 2) "by means of wire communications in interstate commerce" (Counts 3 and 4) in violation of Title 18 U.S.C. §§ 1341 and 1343. (Docket #1).

The defendant argues that "the indictment must be dismissed because it fails to establish loss of a valid property interest under the mail and wire fraud statutes and because it fails to establish that the defendants, and defendant Kurtz specifically, intended to defraud ATCC and the University of Pittsburgh of any property." (Docket #19, ¶ 7).

In response to this argument, the government asserts that since "the Indictment adequately and correctly tracks the language of the mail and wire fraud statutes, and states the dates and places wherein the crimes were committed," the Indictment is valid and therefore the defendant's motion to dismiss must be denied. (Docket #30, pp. 13-14).  Further, as to the deprivation of property, the government argues that "the description of property (and other elements of the fraud scheme) as

alleged in the Indictment is (sic) sufficient to deny the defendant's present motion to dismiss."  (Docket #30, p. 17).

Since "the mail and wire fraud statutes share the same language in relevant part," the "same analysis" will be applied "to both sets of offenses here." *Carpenter v. United States*, 484 U.S. 19, 25, n. 6 (1987); *Fountain v. United States*, 357 F.3d 250, 253 (2d Cir. 2004).  The Court of Appeals for the Second Circuit has expressly stated:

> The elements of a mail [or wire] fraud violation are (1) scheme to defraud, (2) money or property [as the object of the scheme], and (3) use of the mails [or wires] to further the scheme.

*United States v. Dinome*, 86 F.3d 277, 283 (2d Cir. 1996); *Fountain v. Unites States, supra* at 255.

The United States Supreme Court has ruled that

> It does not suffice . . . that the object of the fraud may become property in the recipient's hands; for purposes of the mail fraud statute, the thing obtained must be property in the hands of the victim.

*Cleveland v. United States*, 531 U.S. 12, 15 (2000); *Fountain v. United States, supra* at 253.

Basically, the defendant and his co-defendant, Robert Ferrell, are charged with having defrauded ATCC and the University of Pittsburgh by use of mails and wires

in purchasing biological materials from ATCC through the University of Pittsburgh

account with ATCC for the personal use of the defendant.  More specifically, it is

alleged in the indictment that "the defendants, Steven Kurtz and Robert Ferrell, did

obtain by said scheme and artifice, and by means of false and fraudulent pretenses,

representation, and promises, property from ATCC and the University of Pittsburgh . . .

and the rights, ownership and interest in such [property]."  (Docket #1).  As a result, the

purported victims in the scheme are ATCC and the University of Pittsburgh.

> Although the government is not required to prove actual injury, it must, at a minimum, prove that defendants *contemplated* some actual harm or injury to their victims. Only a showing of intended harm will satisfy the element of fraudulent intent.

*Id*; *United States v. Regent Office Supply Co.*, 421 F.2d 1174 (2d Cir. 1970).

Notwithstanding that proof that defendants possessed a fraudulent intent

is "critical to a showing of a scheme to defraud," the "government is not required to

prove that an intended victim was actually defrauded to establish a violation by the

defendants" of the mail or wire fraud statutes.  *United States v. Starr*, 816 F.2d 94, 98

(2d Cir. 1987); *Durland v. United States*, 161 U.S. 306, 315 (1896).  As a result, "no

actual pecuniary injury, therefore, need result to the victim of the fraud."  *United States

v. Starr, supra*.

However, as the Court of Appeals for the Second Circuit has stated:

> [T]he government must prove that the alleged scheme contemplated depriving another of money or property, and that intent to defraud requires an intent to cause some financial or property loss to another.

*United States v. Rossomando*, 144 F.3d 197, 201 (2d Cir. 1998).

The real thrust of the defendant's argument in support of his motion to dismiss the indictment is that the government will be unable to prove that the "'property' rights alleged to belong to ATCC and the University of Pittsburgh" are sufficient "to constitute a violation of the statutes." (Docket #19, ¶ 10). The defendant argues that neither ATCC nor the University of Pittsburgh have suffered "some loss of money or property" since neither lost "a property interest sufficient to sustain the charges." (Docket #19, ¶ 14). The essence of the defendant's claim is one of insufficiency of evidence, especially with regard to the element of intent to defraud either ATCC or the University of Pittsburgh, and therefore, the indictment should be dismissed.

Even if it is assumed, *arguendo*, that the government will fall short in the required proof, a motion to dismiss the indictment must be considered as being premature and inappropriate in addressing that issue. It is axiomatic that:

> An indictment returned by a legally constituted and unbiased grand jury, like an information drawn by the prosecutor, if valid on its face, is enough to call for trial of the charge on the merits. The Fifth Amendment requires nothing more.

*Costello v. United States*, 350 U.S. 359, 363 (1956).

Furthermore,

[A]n indictment valid on its face is not subject to challenge
on the ground that the grand jury acted on the basis of
inadequate or incompetent evidence.

*United States v. Calandra*, 414 U.S. 338, 345 (1974).

Therefore, based on the foregoing, it is RECOMMENDED that
defendant's motion to dismiss the indictment be DENIED.

**2.     Motion To Suppress Evidence:**

**A.     The "Consensual" Search Of 60 College Street:**

**1.  The May 11, 2004 Search:**

**<u>FACTS</u>**

"On May 11, 2004, a 911 call was placed to the Erie County Emergency
System reporting that a woman was not breathing at 60 College Street, Buffalo, N.Y.
Uniformed officers of the BPD responded, along with Detectives from the Major Crimes
Unit of the BPD."  (Docket #19, Exhibit C attached thereto, ¶ 5 of Hickok affidavit).  The
responding officers were met by the defendant at the premises located at 60 College
Street who gave them entry into the premises and directed them to the second floor of
the house where the officers found a deceased woman who was later identified as the
wife of the defendant.  Since the cause of death "appeared suspicious" to the
detectives, the Erie County Medial Examiner was notified and permission was

requested from the defendant by the detectives to be allowed "to further search 60

College Street" and the defendant "granted consent to search the premises, and signed

a Buffalo Police Department 'Consent to Search' form."  (Docket #19, Exhibit C

attached thereto, ¶¶ 6-7); (*see also* Docket #19, Exhibit G attached thereto).


During the course of the "consented" search, Detective Dates "observed

an apparent biological laboratory within the second floor hallway of the premises"

including "bacterial cultures growing in petri dishes labeled with letters and numbers."

(Docket #19, Exhibit C attached thereto, ¶ 8).  Photographs of this laboratory and its

contents were taken by BPD officers and subsequently supplied to Special Agent

Hickok.  Detective Dates also observed during this "consented" search of the premises,

"approximately 200 books located in . . . an office," several of which "related to

bioterrorism" and a photograph was taken of these books which was subsequently

viewed by Special Agent Hickok.[3]


Detective Dates, as part of the continuing "consent" to search, "observed,

on the first floor of 60 College Street, a wooden crate approximately 4 feet tall by 2 feet

wide" and when questioned about the crate, the defendant stated "that it was a 'bio-

dispersion device'" which "could be used to 'disperse bacteria'."  (Docket #19, Exhibit C

attached thereto, ¶ 10).  The detective also observed "two paper invoices on the lab

---

[3] Part of Special Agent Hickok's background consists of training and education in
biological and chemical warfare from the Center For Disease Control, Department of Army,
and Central Intelligence Agency.  (Docket #19, Exhibit C attached thereto, ¶ 2).

table from ATCC" which described shipments of biological materials.  (Docket #19,

Exhibit C attached thereto, ¶ 14).


The defendant also advised Detective Dates that he "was a member of a

group known as the 'Critical Art Ensemble'" and "that he was having a (sic) art showing

in Massachusetts, and provided Detectives with an invitation to the art show."  (Docket

#19, Exhibit C attached thereto, ¶¶ 14-15).


## DISCUSSION AND ANALYSIS

The defendant claims that he "was under the stress of having lost his wife

within hours of the arrival of the Buffalo Police detectives" and that "under [those]

circumstances, it is unreasonable to believe that [his] 'consent' to search his home on

May 11, 2004, was voluntary and not under the duress of the situation."  (Docket #19,

¶¶ 130, 132).  As a result, he argues that "because his 'consent' to search his residence

was not freely given," . . . "any and all evidence seized during the course of this

[consensual] search, including all observations of the Buffalo Police detectives and/or

other government agents which were made" should be suppressed.  (Docket #19,

¶ 134).

> It is well settled under the Fourth and Fourteenth
> Amendments that a search conducted without a warrant
> issued upon probable cause is '*per se* unreasonable. . .
> subject only to a few specifically established and well-
> delineated exceptions.' (citations omitted).  It is equally well
> settled that one of the specifically established exceptions to

the requirements of both a warrant and probable cause is a
search that is conducted pursuant to consent (citations
omitted).

*Schneckloth v. Bustamonte*, 412 U.S. 218, 219 (1973).

This principle was reaffirmed by the United States Supreme Court in

*Illinois v. Rodriguez*, 497 U.S. 177, 181 (1990) wherein it stated:

> The Fourth Amendment generally prohibits the warrantless
> entry of a person's home, whether to make an arrest or to
> search for specific objects (citations omitted).  The
> prohibition does not apply, however, to situations in which
> voluntary consent has been obtained, either from the
> individual whose property is searched, *see Schneckloth v.
> Bustamonte*, 412 U.S. 218, 36 L Ed.2d 854, 93 S.Ct. 2041
> (1973), or from a third party who possesses common
> authority over the premises, *see United States v. Matlock,
> supra*, at 171, 39 L.Ed.2d 242, 94 S.Ct. 988.

> The Court went on to state:

> As with other factual determinations bearing upon search
> and seizure, determination of consent to enter must "be
> judged against an objective standard: would the facts
> available to the officer at the moment. . . 'warrant a man of
> reasonable caution in the belief'" that the consenting party
> had authority over the premises? (citation omitted).  If not,
> then warrantless entry without further inquiry is unlawful
> unless authority actually existed.  But if so, the search is
> valid.  *Id.* at 188, 189.

The burden of establishing the validity of a consent to search is upon the

government.  *Schneckloth v. Bustamonte, supra* at 222; *Bumper v. North Carolina*, 391

U.S. 543, 548 (1968).  The defendant does not dispute that a "911" emergency call had

been made wherein it was reported that a woman located at 60 College Street, Buffalo,

New York was not breathing; that uniform officers and detectives of the Buffalo Police Department responded to this emergency call; that the defendant responded to the officers' arrival at 60 College Street by greeting them at the entrance door into the premises and that the defendant allowed entry by the police officers into the premises at 60 College Street and directed the officers to the second floor of the house where they found a deceased woman who was later identified as the defendant's wife.  The defendant expressly acknowledges that the officers came to his home "to investigate the sudden and unexpected death of his wife earlier that day" and that "upon beginning their investigation, the detectives observed what appeared to be laboratory equipment and containers of biological materials."  (Docket #19, ¶¶ 127, 128).

It was certainly reasonable for the police officers to believe that the defendant had authority over the premises located at 60 College Street and therefore, their entry into the premises was lawful.  It was while lawfully on the premises on May 11, 2004 that police officers observed the biological laboratory and bacterial cultures growing in petri dishes.  Since they had just discovered a deceased woman, whose death appeared suspicious, it was reasonable for the police officers to follow up on what they had already observed.

Because the police officers were lawfully on the premises of 60 College Street, the "plain-view" doctrine became operative, *i.e.*, "once police are lawfully in a position to observe an item firsthand, its owner's privacy interest in that item is lost; the

owner may retain the incidents of title and possession but not privacy." *Illinois v. Andreas*, 463 U.S. 765, 771 (1983).  Since it appeared to the officers that the death of defendant's wife was suspicious, the biological equipment and materials, as well as the bacterial cultures observed by them, were subject to seizure as evidence of criminal activity. *Illinois v. Andreas, supra*; *Harris v. United States*, 390 U.S. 234, 236 (1968).

However, the police officers chose not to exercise this right of seizure under the plain-view doctrine but rather requested written consent from the defendant to allow them to further search 60 College Street and "remove from [the defendant's] residence . . . items of property whatsoever which they deem[ed] pertinent to their investigation."  Such written consent was given by the defendant when he signed a "Permission To Search" form.  (Docket #19, Exhibit G attached thereto).

Notwithstanding that this Permission To Search form expressly provides that the defendant was "giving this written permission to these officers freely and voluntarily, without any threats or promises having been made, and after having been informed by said officer that [he had] a right to refuse this search and/or seizure," the defendant asserts that his consent to search and seize was not voluntary and freely given, but rather, was given "under the duress of the situation," to wit, "the stress of having lost his wife within hours of the arrival of the Buffalo Police detectives."  (Docket #19, ¶¶ 130, 132).

The United States Supreme Court has ruled

that the question whether a consent to a search was in fact
"voluntary" or was the product of duress or coercion, express
or implied, is a question of fact to be determined from the
totality of the circumstances.  While knowledge of the right to
refuse consent is one factor to be taken into account, the
government need not establish such knowledge as the sine
qua non of an effective consent.  As with police questioning,
two competing concerns must be accommodated in
determining the meaning of a "voluntary" consent – the
legitimate need for such searches and the equally important
requirement of assuring the absence of coercion.

In situations where the police have some evidence of illicit
activity, but lack probable cause to arrest or search, a
search authorized by a valid consent may be the only means
of obtaining important and reliable evidence.

*Schneckloth v. Bustamonte, supra* at 227; *United States v. Garcia*, 56 F.3d 422 (2d Cir.

1995); *United States v. Kon Yu-Leung*, 910 F2d. 33, 41 (2d Cir. 1990).


In the case at bar, the police were confronted with what appeared to be

the death of a woman under suspicious circumstances.  It was incumbent upon them to

investigate this matter further and therefore, there was a "legitimate need" for a search

of the premises as quickly as possible.  This need was best satisfied by seeking and

then obtaining the consent of the defendant to search the premises at 60 College

Street.  The assertions by the defendant that he was not mentally capable of providing

a voluntary consent for such search because he "was under stress" and subject to "the

duress of the situation" are not legally sufficient to warrant a finding that his consent to

search was involuntarily coerced by the investigating officers.  In reviewing the totality of

the circumstances, including the fact that the defendant is a highly educated person

-15-

who is employed as an art professor at the State University of New York at Buffalo

(SUNY), the defendant has failed to establish that the circumstances caused him to be

unaware of what was being requested of him or that the actions of the police in

obtaining the consent amounted to coercion by them.   There is nothing in the present

record to establish that it was not "objectively reasonable" for the officers to believe that

the consent provided by the defendant to search his premises was a voluntary and

therefore valid one which authorized their search of the premises.   Since the police did

not "coerce consent, [the] search conducted on the basis of [the defendant's] consent is

not an unreasonable search."   *Schneckloth v. Bustamonte, supra* at 228; *United States*

*v. Garcia, supra* at 422.   *See also United States v. Luciano*, 329 F.3d 1, 8 (1st Cir. 2003)

(consent voluntary even though defendant was intoxicated because officers judged that

defendant was not so intoxicated that he could not understand that he was waiving

rights); *United States v. Schwensow*, 151 F.3d 650, 660 (7th Cir. 1998) (consent to

search voluntary despite possibility that defendant was delusional at time due to alcohol

withdrawal and effects of anti-anxiety medication); *United States v. Ramey*, 711 F.2d

104, 107-08 (8th Cir. 1983) (consent voluntary even though defendant intoxicated

because defendant was police officer familiar with procedures and his comments

indicated ability to understand); *United States v. Geroge*, 987 F.2d 1428, 1431 (9th Cir.

1993) (consent to search motel room voluntary even though given by defendant in

emergency room suffering from drug overdose); *United States v. Gay*, 774 F.2d 368,

377 (10th Cir. 1985) (consent to search glove box voluntary even though defendant was

under the influence of drugs because defendant answered questions, produced driver's

license, and denied consent to search trunk containing cocaine); *United States v. Barbour*, 70 F.3d 580, 585 (11th Cir. 1995) (consent to search voluntary even though defendant was suicidal, was taking medication, and had been committed to mental health facility because there was no evidence of coercion, and the defendant understood nature of interrogation); *United States v. Mason*, 966 F.2d 1488, 1494 (D.C. Cir. 1992) (consent to search voluntary even though defendant had been shot, was in hospital, and was in considerable pain).

Therefore, it is RECOMMENDED that defendant's motion to suppress evidence seized as a result of the May 11, 2004 search on the basis of an involuntary consent be DENIED.

### 2.  The May 12, 2004 Search:

### FACTS

Detective Dates reported his observations of May 11, 2004 while in the residence located at 60 College Street to Special Agent Hickok.  Thereupon, Special Agent Hickok initiated the investigation which resulted in the present indictment (Docket #1).  On May 12, 2004, F.B.I. agents visited the premises at 60 College Street, and while at that locale confronted the defendant "as he returned to his home." According to the defendant, he "was frisked and advised by these agents that he was not allowed to enter his home and was told to wait on the back stairs of the house."

The defendant further alleges that "he was advised by one of the agents that he was in detention and placed into one of the agent's vehicle.  At [that] time, [he] was presented with two documents entitled 'Consent to Search;' one pertaining to his residence at 60 College Street, Buffalo, New York, and one pertaining to his office, the 'Center for Fine Arts, Room 227A, North Campus, University of Buffalo, Buffalo, New York 14260'." (Docket #19, ¶¶ 135-137; Exhibit H attached thereto).  The defendant signed these consent forms (Docket #19, Exhibit H attached thereto) wherein and whereby they authorized the agents to conduct "a complete search of 60 College Street" and "a complete search of Center for Fine Arts, Room 227A, North Campus University of Buffalo, Buffalo, New York 14260" and "to take any items they determined may be related to their investigation."  However, the defendant alleges that "on May 13, 2004, by letter from defense counsel to Agents Hickok and Utz," he "withdrew this (sic) consent."  (Docket #19, ¶ 139).[4]

## DISCUSSION AND ANALYSIS

Based on the present record before this Court, it is unclear as to whether a search of 60 College Street and the defendant's office at SUNY was conducted by the agents pursuant to the consent forms executed by the defendant on May 12, 2004 and whether anything was seized from these locations based on such "consensual" searches.  Nevertheless, the issue of the validity of these consents will now be addressed by this Court.

---

[4] The government asserts that the defense attorney's letter of May 13, 2004 was sent by telefax to the F.B.I. at 4:52 p.m. of that date.  (Docket #20, p. 47, fn. 29).

The government has not submitted anything to this Court to refute the defendant's sworn statements that prior to signing the consent forms on May 12, 2004 he "was confronted by approximately eight armed agents and frisked;" "advised that [he] was not allowed to re-enter [his] home and that [he] needed to wait on the back stairs of the house;" when he "inquired as to [his] 'status', one of the government agents told [him] that [he] was in 'detention';" and that he "was placed into the automobile of one of the agents" where he apparently signed the consent forms in question. (Docket #19, ¶¶ 135-137).  As a result, these allegations will be deemed true for purposes of this motion and considered as part of the totality of the circumstances in determining the validity of the consents given.

The defendant asserts that on May 12, 2004, he "was not only in custody at the time that he signed these 'consent' forms, but in the unique and highly stressful situation of being advised that he would be constant (sic) contact with these government agents and could not return to his own home" and that "he was still under the shock and emotional duress of the death of his wife the previous day, May 11, 2004."  (Docket #19, ¶ 138).  As a result, he argues that his consent "was not knowingly, intelligently or voluntarily given" and therefore, any evidence seized from his residence or office must be suppressed.

In the alternative, the defendant requests a hearing "to resolve any outstanding factual issues."  (Docket #19, p. 33).

The legal principles enunciated above as to determining the validity of a consent to search the premises at 60 College Street on May 11, 2004 apply equally as well to the determination to be made as to the validity of the consent to search and seize given by the defendant on May 12, 2004 and will not be repeated here.

The written consent forms executed by the defendant on May 12, 2004 (Docket #19, Exhibit H attached thereto) expressly contain the following acknowledgments:

> 2.    I have been advised of my right to refuse consent.
>
> 3.    I give this permission voluntarily.
>
> 4.    I authorize these agents to take any items which they determine may be related to their investigation.

However, the circumstances surrounding the May 12, 2004 consent given by the defendant to the agents contain elements that cause a differentiation from the circumstances existing on May 11, 2004.  More specifically, the defendant has alleged additional facts that he maintains establish coercion on the part of the agents in obtaining his consent to search on May 12, 2004.  These unrefuted facts are: (1) the confrontation "by approximately eight armed agents" and being "frisked;" (2) being advised by the agents that he was in "detention;" (3) being placed in an agent's automobile and being told "that they would accompany [him] wherever [he] intended to go."  (Docket #19, Exhibit F attached thereto, ¶¶ 8, 9, 11, 12).  As a result of these circumstances, coupled with "the sudden and unexpected death of [his] wife on May 11,

2004," the defendant claims that he "was in an extremely coercive situation due to the highly restrictive actions of the agents."  (Docket #19, Exhibit F attached thereto, ¶ 19) and therefore, "his consent to search [his home and office], as purportedly authorized by [the consent forms of May 12, 2004] was not given freely, intelligently and voluntarily."  (Docket #19, ¶ 140), thereby requiring suppression of the evidence seized pursuant to these consents.  Once again, in determining whether a consent to search is valid or not, the "totality of the circumstances must indicate that it was voluntarily given." *United States v. Davis*, 967 F.2d 84, 86 (2d Cir.), *cert. denied by Content v. United States*, 506 U.S. 928 (1992), citing *Schneckloth v. Bustamonte*, 412 U.S. 218, 248-249 (1973).  Stated another way, a determination must be made as to whether, under a totality of the circumstances, "the consent was a 'product of that individual's free and unconstrained choice, rather than a mere acquiescence in a show of authority'." *United States v. Garcia*, 56 F.3d 418, 422 (2d Cir. 1995) (internal citations omitted); *United States v. London*, 148 Fed. Appx. 19, 2005 WL 2136947 (2d Cir. 2005); *United States v. Isiofia*, 370 F.3d 226, 231 (2d Cir. 2004).

Although it can reasonably be argued that a confrontation by eight armed agents on May 12, 2004 caused the defendant to acquiesce in response to such a display of authority, the United States Supreme Court has expressly held that

> [T]he fact of custody alone has never been enough in itself
> to demonstrate a coerced confession or consent to search.

*United States v. Watson*, 423 U.S. 411, 424 (1976); *United States v. Garcia*, 56 F.3d

418, 423 (2d Cir. 1995).

Furthermore, even if the defendant thought he was in "custody" when

confronted by the agents, such belief would not invalidate the consent subsequently

given, nor would it, standing alone, be sufficient to demonstrate that the consents to

search his home and office were coerced consents.  *United States v. Watson*, 423 U.S.

411, 424 (1976); *United States v. Garcia*, 56 F.3d 418, 423 (2d Cir. 1995).  However,

the Court of Appeals for the Second Circuit has stated that even though custody "alone

is not enough to demonstrate involuntariness of consent," such claims of consent

"should be scrutinized with care."  *United States v. Vasquez-Santiago*, 602 F.2d 1069,

1073 (2d Cir.), *cert. denied* 447 U.S. 911 (1979).

Also, the fact that there may have been eight agents on the scene when

the defendant was confronted on May 12, 2004 does not necessarily cause the

subsequent consent to search to be invalid as established by the holding of the Court of

Appeals for the Second Circuit wherein the Court stated:

> Aggravating circumstances such as the handcuffing of the
> consenting party, the presence of numerous police officers
> and the representation that they would remain at the place

> to be searched indefinitely and secure a search warrant if
> consent to search were not given, would not automatically
> cause the search to be invalid.

*United States v. Kon Yu-Leung*, 910 F.2d 33, 41 (2d Cir. 1990); *United States v. Garcia*,

56 F.3d 418, 423 (2d Cir. 1995); *See also Muehler v. Mena*, 544 U.S. ___, 161 L.Ed.2d

299 (2005).


It is pointed out that the defendant has expressly admitted that on May 12,

2004, he was advised "by one of the government agents that [he] did not have to speak

to them and that [he] could get an attorney."  (Docket #19, Exhibit F attached thereto,

¶ 20).  Further, both consent forms executed by the defendant on May 12, 2004

expressly state that the defendant has "been advised of [his] right to refuse consent"

and that he "give[s] this permission voluntarily."  (Docket #19, Exhibit H attached

thereto).


Based on what has been presented to this Court, and after careful

scrutinizing of same, I find that the totality of the circumstances existing on May 12,

2004 indicate that the consent given by the defendant for the search of his residence

and office was a "product of [his] free and unconstrained choice, rather than a mere

acquiescence in a show of authority" and therefore RECOMMEND that defendant's

motion to suppress the evidence seized as a result of such consensual searches be

DENIED.

**A.**     **The Search and Seizure Of May 14, 2004**
              **Pursuant To The Warrant For Search Of The**
              **Premises At 60 College Street, Buffalo, New York**

**FACTS**[5]

"On May 11, 2004, a 911 call was placed to the Erie County Emergency

System reporting that a woman was not breathing at 60 College Street, Buffalo, N.Y.

Uniformed officers of the BPD responded, along with Detectives from the Major Crimes

Unit of the BPD."  (Docket #19, Exhibit C attached thereto, ¶ 5 of Hickok affidavit).  The

responding officers were met by the defendant at the premises located at 60 College

Street who gave them entry into the premises and directed them to the second floor of

the house where the officers found a deceased woman who was later identified as the

wife of the defendant.  Since the cause of death "appeared suspicious" to the

detectives, the Erie County Medial Examiner was notified and permission was

requested from the defendant by the detectives to be allowed "to further search 60

College Street" and the defendant "granted consent to search the premises, and signed

a Buffalo Police Department 'Consent to Search' form."  (Docket #19, Exhibit C

attached thereto, ¶¶ 6-7).

---

[5] The facts are taken from the affidavit of Special Agent Hickok sworn to May 13,
2004 submitted in support of the search warrant application.  (Docket #19, Exhibit C
attached thereto).

During the course of this "consented" search, Detective Dates "observed

an apparent biological laboratory within the second floor hallway of the premises"

including "bacterial cultures growing in petri dishes labeled with letters and numbers."

(Docket #19, Exhibit C attached thereto, ¶ 8).  Photographs of this laboratory and its

contents were taken by BPD officers and subsequently supplied to Special Agent

Hickok.  Detective Dates also observed during this "consented" search of the premises,

"approximately 200 books located in . . . an office," several of which "related to

bioterrorism" and a photograph was taken of these books which was subsequently

viewed by Special Agent Hickok.[6]

_____Detective Dates, as part of the continuing "consent" to search, "observed,

on the first floor of 60 College Street, a wooden crate approximately 4 feet tall by 2 feet

wide" and when questioned about the crate, the defendant stated "that it was a 'bio-

dispersion device'" which "could be used to 'disperse bacteria'."  (Docket #19, Exhibit C

attached thereto, ¶ 10).  The detective also observed "two paper invoices on the lab

table from ATCC" which described shipments of biological materials.  (Docket #19,

Exhibit C attached thereto, ¶ 14).

The defendant also advised Detective Dates that he "was a member of a

group known as the 'Critical Art Ensemble'" and "that he was having a (sic) art showing

---

[6] Part of Special Agent Hickok's background consists of training and education in biological and chemical warfare from the Center For Disease Control, Department of Army, and Central Intelligence Agency.  (Docket #19, Exhibit C attached thereto, ¶ 2).

in Massachusetts, and provided Detectives with an invitation to the art show."  (Docket #19, Exhibit C attached thereto, ¶¶ 14-15).

All of the aforesaid information obtained by Detective Dates while on the premises located at 60 College Street on May 11, 2004 was made known by him to Special Agent Hickok prior to the application for a search warrant for those premises on May 13, 2004.

Special Agent Hickok's investigation conducted prior to the search warrant application established that the "Critical Art Ensemble" appeared "to be a group engaged in political and social advocacy regarding the use of high technology."  An analysis was made of the invitation to the aforesaid art showing which contained "Arabic writing . . . near a depiction of a two door automobile."  It was determined that "a portion of the Arabic writing refer[red] to a past car bombing incident involving 25 pounds of TNT in the country of Morocco."  (Docket #19, Exhibit C attached thereto, ¶¶ 15-16).  Information was also obtained which indicated that the defendant was "a performance artist of the Critical Art Ensemble who in the past [had] been reported to have utilized biological materials in his performances."  (Docket #19, Exhibit C attached thereto, ¶ 17).  Further, the biological material in the petri dishes and described in the aforesaid ATCC shipping receipt were considered to be "agents [that] have been used as stimulants for actual biological warfare agents" and were "bacterial agents within the meaning of 18 U.S.C. § 178(1)."  (Docket #19, Exhibit C attached thereto, ¶ 18).

_____Detective Dates also displayed photographs taken "inside of 60 College Street depicting what appeared to be computer printouts of material related to biological warfare" to Special Agent Hickok on May 12, 2004.  (Docket #19, Exhibit C attached thereto, ¶ 20).

On May 13, 2004, Special Agent Hickok presented an affidavit and application for a search warrant for the premises located at 60 College Street, Buffalo, New York to Judge Foschio who then issued a search warrant for said premises. (*See* Docket #19, Exhibit C attached thereto).  A search of the premises at 60 College Street was conducted by the F.B.I. agents on May 14, 2004 and numerous items were seized from said premises.  (*See* Docket #19, Exhibit D attached thereto).

## DISCUSSION AND ANALYSIS

The defendant argues that the "factual allegations of the [Hickok] affidavit are comprised almost entirely of hearsay and unsupported opinion clearly aimed at portraying defendant Kurtz as a bio-terrorist" and that "the affidavit freely associates the expression of First Amendment freedoms in order to manufacture probable cause where none truly exists."  (Docket #19, ¶¶ 86, 99).  As a result, the defendant claims that the May 13, 2004 affidavit of Special Agent Hickok in support of the search warrant for the premises at 60 College Street was "so lacking in indicia of probable cause as to render reliance upon it unreasonable" and therefore, the items seized pursuant to the warrant "should be suppressed."  (Docket #19, ¶ 104).  The defendant also claims that

the affidavit of Special Agent Hickok was so overgeneralized as to cause the search

warrant based on such affidavit to be overly broad and therefore in violation of the

Fourth Amendment's requirement of particularization thereby requiring suppression of

the evidence seized.


      In determining whether probable cause exists for the issuance of a

warrant, the United States Supreme Court has stated:


> The totality of the circumstances approach is far more
> consistent with our prior treatment of probable cause than is
> any rigid demand that specific "tests" be satisfied by every
> informant's tip.  Perhaps the central teaching of our
> decisions bearing on the probable-cause standard is that it
> is a "practical, nontechnical conception."  (citation omitted).
> "In dealing with probable cause, . . . as the very name
> implies, we deal with probabilities.  These are not technical;
> they are the factual and practical considerations of everyday
> life on which reasonable and prudent men, not legal
> technicians, act."  (citation omitted.)


> In *Aguilar,* we required only that "the magistrate must be
> informed of *some of the underlying circumstances* from
> which the informant concluded that . . . narcotics were where
> he claimed they were, and *some of the underlying
> circumstances* from which the officer concluded that the
> informant . . . was "credible" or his information "reliable."
> (citation omitted).

> As our language indicates, we intended neither a rigid
> compartmentalization of the inquiries into an informant's
> "veracity," "reliability," and "basis of knowledge," nor that
> these inquiries be elaborate exegeses of an informant's tip.
> Rather, we required only that *some* facts bearing on two
> particular issues be provided to the magistrate.

* * *

> The task of the issuing magistrate is simply to make a
> practical, common-sense decision whether, given all the
> circumstances set forth in the affidavit before him, including
> the "veracity" and "basis of knowledge" of persons supplying
> hearsay information, there is a fair probability that
> contraband or evidence of a crime will be found in a
> particular place.  And the duty of a reviewing court is simply
> to ensure that the magistrate had a "substantial basis . . . for
> [conclud[ing]" that probable cause existed.  (citation
> omitted).  We are convinced that this flexible, easily applied
> standard will better achieve the accommodation of public
> and private interests that the Fourth Amendment requires
> than does the approach that has developed from *Aguilar* and
> *Spinelli*.

*Illinois v. Gates*, 462 U.S. 213, 231, 238-239 (1983).

As the Court of Appeals for the Second Circuit stated:

> A plaintiff who argues that a warrant was issued on less than
> probable cause faces a heavy burden.   "Where [the]
> circumstances are detailed, where reason for crediting the
> source of the information is given, and when a magistrate has
> found probable cause, the courts should not invalidate the
> warrant by interpreting the affidavit in a hypertechnical, rather
> than a commonsense, manner. . . . [T]he resolution of doubtful
> or marginal cases in this area should be largely determined by
> the preference to be accorded to warrants."  *United States v.
> Ventresca*, 380 U.S. 102, 109, 85 S.Ct. 741, 746, 13 L.Ed.2d
> 684 (1965).  In particular, where the officer requesting the
> search warrant relies on an informant, the magistrate's role is
> to examine the totality of the circumstances and to make
> a practical, commonsense decision whether, given all the
> circumstances set forth in the affidavit before him, including
> the "veracity" and "basis of knowledge" of persons supplying
> hearsay information, there is a fair probability that
> contraband or evidence of a crime will be found in a
> particular place.  And the duty of a reviewing court is simply
> to ensure that the magistrate had a "substantial basis for . . .
> conclud[ing]" that probable cause existed.  *Illinois v. Gates*,
> 462 U.S. 213, 238-39, 103 S.Ct. 2317, 2332, 76 L.Ed.2d 527
> (1983) (quoting *Jones v. United States*, 362 U.S. 257, 271, 80

S.Ct. 725, 736, 4 L.Ed.2d 697 (1960)); *see United States v.
Feliz-Cordero*, 859 F.2d 250, 252-53 (2d Cir. 1988).

*Rivera v. United States*, 928 F.2d 592, 602 (2d Cir. 1991).

In the case at bar, we are not dealing with information supplied by an
informant.  Rather, Special Agent Hickok's affidavit iterates the information he received
from Detective Dates who personally observed the items described in Special Agent
Hickok's affidavit, including the taking of photographs of some of those items.  As
determined above, Detective Dates was lawfully on the premises at 60 College Street
and had been voluntarily given permission by the defendant to conduct a search of the
premises and to seize any items or property which the detectives "deem[ed] pertinent to
their investigation."  (*See* Exhibit G attached to Docket #19).  The affidavit of Special
Agent Hickok sworn to May 13, 2004 in support of the search warrant application
described the circumstances in detail based on the information supplied by Detective
Dates whom he identified in the affidavit as well as the additional investigative steps
that he (Hickok) undertook.  Further, Special Agent Hickok utilized his own training and
experience in determining the significance of these items in the context of establishing
probable cause that a violation of law had or was occurring.  It was proper for him to
make such utilization and for Judge Foschio to accept his assertions based on the
agent's training and experience.  *United States v. Benevento*, 836 F.2d 60, 71 (2d Cir.
1987); *cert. denied* 486 U.S. 1043 (1988); *United States v. Fama*, 758 F.2d 834, 838
(2d Cir. 1985); *United States v. Cruy*, 785 F.2d 399, 405-06 (2d Cir. 1986).  The
defendant has not presented any evidence that vitiates the credibility of either Detective

Dates or Special Agent Hickok as to the contents observed on May 11, 2004 at the premises located at 60 College Street.

The defendant has failed to meet his "heavy burden" of establishing that probable cause was lacking for the issuance of the warrant.  Considering the totality of the circumstances set forth in Special Agent Hickok's affidavit sworn to May 13, 2004, there was a fair probability that evidence of a crime would be found at the premises located at 60 College Street, Buffalo, New York.  Therefore, it is RECOMMENDED that defendant's motion to suppress the evidence on the basis of no probable cause be DENIED.

### C.   Suppression Of The Computer Disks Seized Pursuant To A Warrant Dated June 18, 2004:

Special Agent Hickok presented a sworn application and affidavit sworn to June 18, 2004 in support of a request for a search warrant to seize and search certain computer disks that were in the possession of the University of Pittsburgh, the employer of the co-defendant, Ferrell, and SUNY, the employer of defendant.  In his affidavit (Docket #19, Exhibit E attached thereto), Special Agent Hickok stated that the investigation established that there had been e-mail communications between the defendant and Ferrell regarding certain biological agents, to wit, bacillus atrophaeus and serratia marcescens, that Ferrell had "admitted (among other things) that he received [those] two biological agents from ATCC because Kurtz requested them from him" and that "he sent them to Kurtz at 60 College Street via a mail carrier."  (Docket

#19, Exhibit E attached thereto, ¶¶ 8, 9).  Special Agent Hickok further asserted in his

affidavit that "during the search conducted pursuant to a warrant from this Court for 60

College Street, F.B.I. special agents working with [him] in this investigation recovered

(among numerous other items) two packing lists indicating that a company known as

ATCC, based in Manassas, Virginia, had shipped to the University of Pittsburgh two

biological agents known as serratia marcescens and bacillus atrophaeus" along with

"biological materials [which were] positively identified as serratia marcescens and

bacillus atrophaeus."  Also according to Special Agent Hickok, the investigation

established that both the University of Pittsburgh and SUNY "provide[d] free Internet

electronic mail ("e-mail") access to their faculty (sic), and that stored electronic

communications, including documents, files, and opened and unopened e-mail, may be

located on the Universities' computers."  (Docket #19, Exhibit E attached thereto, ¶¶ 7,

9, 3).


        Special Agent Hickok also incorporated his affidavit sworn to May 13,

2004 which was used in support of the application for the search warrant dated May 13,

2004 authorizing the search of 60 College Street in his affidavit and application for the

search warrant of June 18, 2004 authorizing the seizure and search of certain computer

disks.


        The defendant argues that the "information purportedly received by Agent

Hickok from the ATCC representative is unsupported and un-corroborated hearsay

from an unidentified informant, whose credibility has not been sufficiently established"

and that "the lack of any allegation of harm, *i.e.*, a loss of money or property, guts the probable cause that an offense was committed and renders reliance upon the search warrant unreasonable."  (Docket #19, ¶ 121).  As a result, the defendant asserts that the evidence consisting of the computerized disks seized from the University of Pittsburgh and SUNY "should be suppressed for failure to establish valid probable cause."  In the alternative, the defendant requests that "a hearing be held to resolve any outstanding factual issues, including for (sic) the purpose of establishing the identity of any alleged informants, as well as the specific information that they allegedly provided to Agent Hickok, as well as the veracity of each informant."  (Docket #19, p. 29).

The same legal reasoning set forth herein in regard to defendant's motion to suppress the evidence seized from his residence at 60 College Street pursuant to the search warrant of May 13, 2004 equally applies to defendant's motion to suppress the computer disk evidence and therefore, it will not be repeated.  Therefore, it is RECOMMENDED that this motion to suppress be DENIED.

Since the defendant appears to be claiming that it was "unreasonable" for the agents to rely on the search warrant of June 18, 2994 (Docket #19, ¶ 121) and requests a hearing in that regard, I treat such request as one for a *Franks* hearing (*Franks v. Delaware*, 438 U.S. 154 (1978).

In *Franks v. Delaware*, the United States Supreme Court set forth the following standards for challenging an affidavit supporting a search warrant:

> To mandate an evidentiary hearing, the challenger's attack must be more than conclusory and must be supported by more than a mere desire to cross-examine. There must be allegations of deliberate falsehood or of reckless disregard for the truth, and those allegations must be accompanied by an offer of proof. They should point out specifically the portion of the warrant affidavit that is claimed to be false; and they should be accompanied by a statement of supporting reasons. Affidavits or sworn or otherwise reliable statements of witnesses should be furnished, or their absence satisfactorily explained. Allegations of negligence or innocent mistake are insufficient. . . . Finally, if these requirements are met, and if, when material that is the subject of the alleged falsity or reckless disregard is set to one side, there remains sufficient content in the warrant affidavit to support a finding of probable cause, no hearing is required.

*Id.* at 171-172.

The defendant has failed to meet these requirements and therefore, it is RECOMMENDED that this request for a hearing as part of his motion to suppress also be DENIED.

### D.    Defendant's Motion To Suppress His Statements:

The defendant alleges that on two separate occasions or "situations," he "was subjected to custodial interrogation without the benefit of proper Miranda warnings" and therefore, the statements that he made during these "situations" should be suppressed.  (Docket #19, ¶¶ 142-144).

### 1.    The Statements of May 11, 2004:

While the Buffalo Police were on the premises at 60 College Street on

May 11, 2004 in response to the 911 call and as part of their investigation of the

"suspicious" death of defendant's wife, they observed "what appeared to be a lab set up

in the house" as well as "many petri dishes."  As a result, Detective Dates asked the

defendant "what purpose they served."  Initially the defendant responded that "the petri

dishes were for testing foods but later stated that bacteria were used in his art shows."

The defendant further advised that the "bacteria in the upstairs of the residence were

'level 1' bacteria" and that "he knew anthrax to be 'level 2' and eboli to be a 'level 3 or

4'."  When asked by Detective Dates if he had problems transporting the bacteria when

he flew to his art shows, the defendant replied "that he had friends at several

universities where he could 'just go and cook some up'."  In response to Detective

Dates' question about the contents of a large crate near the front entry door for the

residence, the defendant advised "that it contained a biodispersal machine which was

also used in his art show."  (Docket #19, Exhibit I attached thereto).

### 2.    The Statement Of May 12, 2004:

On May 12, 2004, the defendant was placed under surveillance by

members of the Joint Terrorism Task Force ("JTTF") and on that day, the defendant

was advised by the agents that he [was] not allowed back into his residence because of

public safety concerns" and further, "that he [was] not under arrest" and that "he [could]

contact an attorney or not speak with law enforcement personnel."  (Docket #19, Exhibit

J attached thereto).  The defendant's activities for the entire day, commencing at 2:10 p.m., were under surveillance and the defendant was aware of such surveillance.

Although the defendant claims that "during the course of this day [May 12, 2004], the agents asked incriminating questions of [him] regarding [his] purported use of biological agents and the equipment observed in [his] home," (Docket #19, ¶ 18), he does not list or describe any alleged incriminating statements that he made that should be suppressed.

## DISCUSSION AND ANALYSIS

The defendant asserts that because he "was never properly advised of his *Miranda* rights prior to being subjected to custodial interrogation, he did not make a knowing, intelligent and voluntary waiver of his Fifth Amendment rights" and therefore, "this violation of [his] rights renders his statements inadmissible" thereby requiring "suppression of any and all statements attributable to him."  (Docket #19, ¶¶ 160-161). In the alternative, the defendant requests that a pretrial hearing be held "to determine (1) the voluntariness of such statements and (2) whether [he] was properly advised of his constitutional rights under *Miranda v. Arizona*, 384 U.S. 436 (1966)."  (Docket #19, ¶ 161).

In *Miranda v. Arizona,* 384 U.S. 436, 444 (1966), the United States Supreme Court created a procedural mechanism with the purpose of establishing a

prophylactic safeguard that would protect a defendant from the coercive nature of custodial interrogation and preserve his Fifth Amendment privilege against self-incrimination.  However, before the requirements of *Miranda* come into play, there must be a form of "custody" of the person to be interrogated which "custody" amounts to the deprivation of "freedom of action in any significant way."  *See also Thompson v. Keohane*, 516 U.S. 99, 100-01 (1995); *Tankleff v. Senkowski*, 135 F.3d 235, 242 (2d Cir. 1998).  The defendant bears the burden of proving custody.  *See United States v. Charles*, 738 F.2d 686, 692 (5th Cir. 1984).  In making a determination of whether such "custody" existed, the Court must consider the totality of the circumstances.  *Tankleff v. Senkowski, supra; California v. Beheler*, 463 U.S. 1131, 1125 (1983).  "Although the circumstances of each case must certainly influence a determination of whether a suspect is 'in custody' for purposes of receiving Miranda protection, the ultimate inquiry is simply whether there is a 'formal arrest or restraint on freedom of movement' of the degree associated with a formal arrest."  (Citation omitted).  *California v. Beheler* at 1125; *Oregon v. Mathiason*, 429 U.S. 492, 495 (1977).  The United States Supreme Court has "explicitly recognized that Miranda warnings are not required 'simply because the questioning takes place in the station house, or because the questioned person is one whom the police suspect'."  *California v. Beheler* at 1125; *Mathiason* at 495.

       In making the determination as to whether "custody" existed, the Court of Appeals for the Second Circuit has stated:

The Supreme Court has held that two discrete inquiries are involved in determining whether a person is "in custody" for Miranda purposes: "first, what were the circumstances surrounding the interrogation; and second, given those circumstances, would a reasonable person have felt he or she was not at liberty to terminate the interrogation and leave." *Thompson*, 516 U.S. at 112, 116 S.Ct. at 465 (footnote omitted).

\* \* \*

The test used in determining whether a defendant was in custody is an objective one that (a) asks whether a reasonable person would have understood herself to be subjected to restraints comparable to those associated with a formal arrest, and (b) focuses upon the presence or absence of affirmative indications that the defendant was not free to leave. An accused is in custody when, even in the absence of an actual arrest, law enforcement officials act or speak in a manner that conveys the message that they would not permit the accused to leave.

*United States v. Kirsh*, 54 F.3d 1062, 1067 (2d Cir.) (internal quotation marks and citation omitted, *cert. denied*, 516 U.S. 927, 116 S.Ct. 330, 133 L.Ed.2d 230 (1995); *see also United States v. Morales*, 834 F.2d 35, 38 (2d Cir. 1987) (a custodial setting is evidenced by "inherently coercive pressures that tend to undermine the individual's will to resist and to compel him to speak").

*Tankleff v. Senkowski*, *supra* at 243-44.

Since counsel for the government states that "the government agrees that the defendant may have alleged that his statements were not voluntary, thereby justifying a hearing on this topic out of an excess of caution," (Docket #30, p. 83), this Court will schedule such a hearing to be held within the next sixty (60) days. Therefore, the defendant's alternate request for a pretrial hearing to determine the voluntariness of

his statements of May 11 and 12, 2004 to the Buffalo Police and F.B.I. agents is GRANTED.

Accordingly, pursuant to 28 U.S.C. § 636(b)(1), it is hereby

**ORDERED** that this Report, Recommendation and Order be filed with the Clerk of the Court.

**ANY OBJECTIONS** to this Report, Recommendation and Order must be filed with the Clerk of this Court within ten (10) days after receipt of a copy of this Report, Recommendation and Order in accordance with the above statute, Fed.R.Crim.P. 58(g)(2) and Local Rule 58.2.

The district judge will ordinarily refuse to consider *de novo*, arguments, case law and/or evidentiary material which could have been, but were not presented to the magistrate judge in the first instance.  *See, e.g., Patterson-Leitch Co., Inc. v. Massachusetts Municipal Wholesale Electric Co.*, 840 F.2d 985 (1st Cir. 1988). **<u>Failure to file objections within the specified time or to request an extension of such time waives the right to appeal the District Judge's Order.</u>**  *Thomas v. Arn*, 474 U.S. 140 (1985); *Wesolek, et al. v. Canadair Ltd., et al.*, 838 F.2d 55 (2d Cir. 1988).

The parties are reminded that, pursuant to Rule 58.2 of the Local Rules for the Western District of New York, "written objections shall specifically identify the portions of the proposed findings and recommendations to which objection is made and the basis for such objection and shall be supported by legal authority." **Failure to comply with the provisions of Rule 58.2, or with the similar provisions of Rule 58.2 (concerning objections to a Magistrate Judge's Report, Recommendation and Order), may result in the District Judge's refusal to consider the objection.**

S/ H. Kenneth Schroeder, Jr.
**H. KENNETH SCHROEDER, JR.**
**United States Magistrate Judge**

**DATED:**     **Buffalo, New York**
            **January 12, 2006**