UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK

---

UNITED STATES OF AMERICA,

               v.                                            ORDER
                                                                04-CR-0155A

STEVEN KURTZ,

                           Defendant.

---

## INTRODUCTION

On June 29, 2004, defendant Steven Kurtz was charged by indictment with two counts of mail fraud, in violation of 18 U.S.C. § 1341, and two counts of wire fraud, in violation of 18 U.S.C. § 1343. The indictment alleges that the defendant, a faculty member of the Art Department of the State University of New York at Buffalo, sought to acquire samples of certain biological materials from a supplier of such materials, American Type Culture Collection ("ATCC"), a not-for-profit organization located in Manassas, Virginia.  ATCC had a policy, however, of selling biological materials only to approved businesses and institutions with a demonstrated need for such materials.  Such businesses and institutions were required to submit an application and become registered customers of ATCC.  Under its policy, ATCC did not sell biological materials to individual purchasers, such as the defendant.

The indictment alleges that the defendant circumvented ATCC's policy of not selling biological materials to individuals by entering into a scheme with Robert Ferrall, the principal investigator for the University of Pittsburgh ("UP") Human Genetics Laboratory, and Chairman of UP's Department of Human Genetics, to defraud ATCC.  UP was a registered customer of ATCC.  Under the scheme, Ferrell ordered the biological materials that the defendant wanted from ATCC using UP's ATCC account, and then once the materials were received by Ferrell, he provided them to the defendant.

This case was referred to Magistrate Judge H. Kenneth Schroeder, Jr., pursuant to 28 U.S.C. § 636(b)(1)(A), on July 13, 2004.  On January 21, 2005, defendant filed an omnibus motion seeking, *inter alia*, dismissal of the indictment because it fails to allege that the victims were deprived of "property" within the meaning of the mail and wire fraud statutes, and because it fails to allege that the defendant intended to defraud ATCC and UP of any property.  On January 12, 2006,  Magistrate Judge Schroeder filed a Report and Recommendation, recommending, *inter alia*, that defendant's motion to dismiss be denied.

Defendant filed objections to the Report and Recommendation, and the government filed a response thereto.  Oral argument on the objections was held on December 18, 2007 and January 28, 2008.  Following oral argument, the Court requested further briefing, which was completed on March 14, 2008.

2

Pursuant to 28 U.S.C. 636(b)(1), this Court must make a *de novo* determination of those portions of the Report and Recommendation to which objections have been made. Upon a *de novo* review of the Report and Recommendation, and after reviewing the submissions from the parties and hearing argument from counsel, the Court declines to adopt the proposed findings of the Report and Recommendation. For the reasons stated herein, the Court grants the defendant's motion to dismiss the indictment.

## **DISCUSSION**

**1.    *Standard for Pretrial Motion to Dismiss***

Rule 12(b) of the Federal Rules of Criminal Procedure provides that a motion to dismiss may raise "any defense, objection, or request which is capable of determination without a trial of the general issue." A pretrial motion to dismiss an indictment under Rule 12 must satisfy "a high standard." United States v. Lazore, 90 F. Supp. 2d 202, 203 (N.D.N.Y. 2000).

> [A]n indictment is sufficient if it, first, contains the elements of the offense charged and fairly informs a defendant of the charge against which he must defend, and, second, enables him to plead an acquittal or conviction in bar of future prosecutions for the same offense. It is generally sufficient that an indictment set forth the offense in the words of the statute itself, as long as those words of themselves fully, directly, and expressly, without any uncertainty or ambiguity, set forth all the elements necessary to constitute the offence intended to be punished. Undoubtedly the language of the statute may be used in the general description of an offence, but it

>must be accompanied with such a statement of the facts and circumstances as will inform the accused of the specific offence, coming under the general description, with which he is charged.

Hamling v. United States, 418 U.S. 87, 117 (1974) (internal quotations and citations omitted). "[T]he sufficiency of the evidence is not appropriately addressed on a pretrial motion to dismiss an indictment," United States v. Alfonso, 143 F.3d 772, 777 (2d Cir.1998), therefore the court accepts as true the facts alleged in the indictment and determines only whether the indictment is "valid on its face." Costello v. United States, 350 U.S. 359, 363 (1956).

### 2.   *Insufficiency of the Indictment*

Defendant argues that the indictment must be dismissed because it fails to allege that the victims were deprived of "property" within the meaning of the mail and wire fraud statutes, and because it fails to allege that the defendant intended to defraud ATCC and UP of any property. The Court agrees that, as written, the indictment is insufficient on its face.

The "essential elements of a mail or wire fraud violation are (1) a scheme to defraud, (2) money or property as the object of the scheme, and (3) use of the mails or wires to further the scheme." Fountain v. United States, 357 F.3d 250, 255 (2d Cir. 2004), cert. denied, 544 U.S. 1017 (2005) (quotation marks, citation, and brackets omitted). Because the mail fraud and the wire fraud statutes use the same relevant language, they are analyzed the same way.

United States v. Schwartz, 924 F.2d 410, 416 (2d Cir.1991).  In the context of mail fraud and wire fraud, "the words 'to defraud' commonly refer 'to wronging one in his property rights by dishonest methods or schemes,' and 'usually signify the deprivation of something of value by trick, deceit, chicane or overreaching.' " McNally v. United States, 483 U.S. 350, 358 (1987) (quoting Hammerschmidt v. United States, 265 U.S. 182, 188 (1924)).  It need not be shown that the intended victim of the fraud was actually harmed; it is enough to show the defendant contemplated doing actual harm, that is, something more than merely deceiving the victim.  See United States v. Regent Office Supply Co., 421 F.2d 1174, 1180-81 (2d Cir.1970).  As a consequence, the deceit practiced must be related to the contemplated harm, and that harm must be found to reside in the bargain sought to be struck.  Id. at 1182.

Here, each count of the indictment alleges that as a result of the scheme to defraud, defendant obtained "property from ATCC and the University of Pittsburgh consisting of the biological agent . . . , and the rights, ownership and interest in such biological agent . . .."  Thus, the government alleges that there were two victims of the alleged scheme to defraud, ATCC and UP, and that they were each deprived of two types of "property," the biological agent itself and the "rights, ownership and interest" in the biological agent.

With regard to ATCC as an alleged victim, the biological agent itself cannot, without more, constitute the "property" or thing of value of which ATCC

5

was deprived, because ATCC was actually paid for the biological agents. ATCC was in the business of selling biological agents in exchange for money, and in this case it got what it bargained for. Ferrell, using the UP account, paid ATCC for the biological agents. Therefore, ATCC was not deprived of the biological agents–it simply sold them. In order for the indictment to allege a valid charge of mail or wire fraud under these circumstances, it must allege that ATCC was deprived of some property right beyond the actual biological agents themselves. See Schwartz, 924 F.2d at 420-21 (where the seller of goods (night vision goggles) was paid for such goods, wire fraud indictment must allege a deprivation of "property" beyond the goods themselves).

Nor is the allegation that ATCC was deprived of its "rights, ownership and interest" in the biological agents sufficient. It is not clear what this allegation even means. On its face, it would appear to be simply another way of saying that the defendant sought to obtain the biological agents from ATCC. In its submissions, the government states that this language refers to ATCC's "intellectual property rights" in the biological agents. Docket No. 128 at 9. However, there is no allegation that the defendant intended to deprive ATCC of any intellectual property rights associated with the biological agents. For example, there is no claim that the defendant intended to reproduce the biological agents and sell them, or that he intended to resell them under a different trademark, etc.

6

With regard to UP as an alleged victim, the indictment is also insufficient. There is no allegation in the indictment that UP ever actually possessed the biological agents, or had any "right, ownership or interest," such as intellectual property rights, in such materials. In fact, there is no allegation that UP itself was ever even aware that the biological agents had been ordered or received by Ferrell. The indictment alleges that Ferrell ordered the biological agents, and that when he received them, he transferred them to the defendant. UP's real loss was the UP funds that Ferrell used to pay for the biological agents, not the biological agents themselves. Yet, the indictment contains no allegation regarding the money lost by UP.

Moreover, even if it were assumed that UP was deprived of "property" in the form of the biological agents, the indictment would still be insufficient because it does not allege any type of misrepresentation or fraudulent conduct directed toward UP, as opposed to ATCC, regarding the biological agents. For example, the indictment does not allege that Ferrell misrepresented to UP that the biological agents were to be used in the UP laboratory for official purposes when in fact they were to be transferred to the defendant.

3.   *No-Sale Theory*

Perhaps recognizing the potential insufficiency of the indictment, the government asserts, in its response to the motion to dismiss, a so-called "no-sale" theory of fraud.  The government argues that defendant's scheme to defraud induced ATCC to sell biological agents to Ferrell that it would not have sold had it know that Ferrell in fact intended to transfer such biological agents to the defendant, who was not a registered ATCC customer.  In other words, the government argues that ATCC was denied the right to control to whom it sold its product.

The Second Circuit most recently discussed this "no-sale" theory of fraud in the case of United States v. Shellef, 507 F.3d 82 (2d Cir. 2007).   In Shellef, the defendant allegedly misrepresented to the manufacturer of a regulated solvent that he was purchasing solvent for resale overseas, and thus was not subject to excise taxes.  He instead sold the solvent domestically.  The indictment charged him, *inter alia*, with wire fraud under the "no-sale" theory of fraud.  The indictment alleged that the defendant's misrepresentations that he would sell the solvent overseas induced the manufacturer to sell solvent to him that it would not have sold had it known that he, in fact, intended to sell it domestically.  The defendant was convicted, *inter alia*, of wire fraud and appealed.

The Second Circuit reversed the conviction, holding that the indictment was insufficient to allege a "no-sale" theory of wire fraud. As part of its analysis, the court discussed its prior cases involving the "no-sale" theory of fraud:

> Our cases have drawn a fine line between schemes that do no more than cause their victims to enter into transactions they would otherwise avoid-which do not violate the mail or wire fraud statutes-and schemes that depend for their completion on a misrepresentation of an essential element of the bargain-which do violate the mail and wire fraud statutes.
>
> In <u>United States v. Regent Office Supply Co.</u>, 421 F.2d 1174 (2d Cir.1970), the defendants sold stationery, <u>id</u>. at 1176. The defendants' scheme consisted of directing their sales personnel to misrepresent their identities to prospective customers so that the customers would be willing to entertain their offers. <u>See id</u>. (noting, as an example, that the sales personnel fraudulently claimed that they had been referred by a friend of the customer or an officer of the customer's firm). We concluded that no conviction under the mail fraud statute could stand where the misrepresentation was "not directed to the quality, adequacy or price of goods to be sold, or otherwise to the nature of the bargain." <u>See id</u>. at 1179.
>
> <u>United States v. Starr</u>, 816 F.2d 94 (2d Cir.1987), is similar. The defendants there collected bulk mailings from their customers and then sent them through the post office. <u>See id</u>. at 95-96. At the post office, however, they hid high-rate mail in low-rate mail packages, and paid the low-rate price for the entire shipments. <u>Id</u>. at 96. The defendants nonetheless charged their customers as if the mailings were high-rate, and produced and mailed false invoices to show that the high-rate price had in fact been paid. <u>Id</u>. We decided that "[t]he misappropriation of funds simply ha[d] no relevance to the object of the contract; namely, the delivery of mail to the appropriate destination in a timely fashion." <u>Id</u>. at 100. Because "[m]isrepresentations amounting only to a deceit are insufficient to maintain a mail or wire fraud prosecution," we concluded that such a charge can not apply to situations where the alleged victims

> "received exactly what they paid for" and "there was no discrepancy between benefits reasonably anticipated and actual benefits received." Id. at 98-99 (internal quotation marks and citation omitted); cf. id. at 102 (Newman, J., concurring) ("An indictment for defrauding the Postal Service would have led to a conviction that would surely have been affirmed. However, the indictment for defrauding the customers has led to a conviction that must be reversed.")
>
> In Schwartz, 924 F.2d 410, however, we were faced with the type of misrepresentation that Regent Office recognized might form the basis for a wire fraud prosecution-that is, one "directed to ... the nature of the bargain," id. at 1179. The defendants in Schwartz had purchased night-vision goggles from Litton Industries. Schwartz, 924 F.2d at 414. Because the Arms Export Control Act restricted the sale of these goggles to certain nations, Litton sought assurances, both in the contract and during the course of performance, that the defendants would not export to the restricted nations. Id. Though the defendants promised to abide by all applicable export regulations, they sold the goggles to nations that were prohibited from purchasing them. Id. at 414-16. We upheld their conviction for wire fraud under a no-sale theory because the "misrepresentations went to an essential element of the bargain between the parties and were not simply fraudulent inducements to gain access to Litton equipment." Id. at 421. The defendants had "deprived Litton of the right to define the terms for the sale of its property in that way," that is, that its product not be exported from this country illegally, and therefore "cost it, as well, good will." Id.

Shellef, 507 F.3d at 107-109.

Applying these cases to the case before it, the Second Circuit concluded:

> As in Starr, the indictment here does not allege, pursuant to the government's "no-sale" theory, that there was a "discrepancy between benefits reasonably anticipated" and actual benefits received. And as in Regent Office, it fails to allege that [the defendant] misrepresented "the nature of the bargain." Instead, the indictment states only that [the defendant's] misrepresentation induced [the manufacturer] to enter into a transaction it would

10

otherwise have avoided. Because it does not assert that [the defendant's] misrepresentation had "relevance to the object of the contract," we do not think it is legally sufficient.

Shellef, 507 F.3d at 109 (citations omitted).

The Second Circuit recognized that the facts in Shellef closely resembled the facts in Schwartz and that there might be sufficient evidence to prove a "no-sale" theory. However, because the Shellef indictment failed to plead sufficiently the "no-sale" theory, the fraud conviction based on a "no-sale" theory could not stand. Id.

Applying Shellef to the instant case, it is clear that the indictment does not sufficiently allege a "no-sale" theory of fraud. The indictment does not define the "property" of which the alleged victim was deprived as *the right to define the sale of its property*. Instead, the indictment alleges that the "property" was the biological agents themselves, which as discussed above, is insufficient.[1] In addition, there is no allegation that the defendant's scheme depended on a misrepresentation of an essential element of the bargain. Although the indictment does allege that the Material Transfer Agreement which accompanied each shipment provided that the purchaser not transfer the biological materials, it

---

[1] The Schwartz decision makes clear that the biological agents themselves cannot constitute the "property" that was the object of the scheme to defraud. In Schwartz, the Second Circuit recognized that because the defendant had paid for the night vision goggles, the "property" of which the victim manufacturer was deprived had to be something beyond the night vision goggles themselves for purposes of the fraud statutes. The court found that the "property" was the right to define the terms of the sale of the night vision goggles.

11

does not allege that this restriction on transfer was an essential element of the bargain or that the defendant's scheme depended on a misrepresentation regarding the transfer restriction.  In fact, the indictment does not allege that either the defendant or Ferrell even knew about the transfer restriction.

The Court passes no judgment on whether the indictment could have been drafted in such a way, based on the facts and circumstances as they have been presented here, to allege sufficiently a "no-sale" theory of fraud.  It simply finds that the indictment, as currently written, fails to allege such a theory.

## CONCLUSION

For the reasons stated, the Court grants the defendant's motion to dismiss the indictment.

SO ORDERED.

>	s/ *Richard J. Arcara*
>	HONORABLE RICHARD J. ARCARA
>	CHIEF JUDGE
>	UNITED STATES DISTRICT COURT

DATED:  April  21, 2008